Case 24-1210, Southern District of Iowa, United States v. Antonio Airhart Good morning. May it please the Court. Mr. Airhart was convicted of possession of ammunition after a jury trial. The ammunition was shell casings found after a shooting, specifically 11 rounds of Armscore 10mm ammunition and 2 rounds of Hornaday 10mm ammunition. And the government asserted that Mr. Airhart was one of the shooters. Today I will focus on the two evidentiary arguments raised in the brief. As part of its case, the prosecution introduced into evidence that an empty box of Winchester ammunition, as well as shell casings of a different caliber, were found in Mr. Airhart's girlfriend's dresser. They also introduced evidence that Mr. Airhart's fingerprint was found on the box of ammunition. The admission of this evidence was an error and requires reverse enromment for a new trial. First, it's not intrinsic to the crime charged. It's a different brand of the ammunition that was charged in the indictment, and the ammunition itself is of a different caliber. So it's not relevant to whether Mr. Airhart possessed the separate ammunition, the shell casings found outside. And there was a lot of discussion by the district court and by the prosecution in their brief about, well, it shows a connection to the house. I frankly am not clear on why that matters in and of itself to show a connection to the house, but it really wasn't disputed. That was his girlfriend. He had mail there. He had clothes there. So it wasn't necessary to put on a box of ammunition and an empty box of ammunition and then ammunition itself and showing that he had his fingerprint on it to say, well, he has a connection to this house. So there was nothing else about the house. I thought maybe they were saying, well, he ran there right after the shooting. Is that in any way necessary to putting the pieces together as to who shot? I would say no, Your Honor. It's not relevant to show. I mean, there was evidence, I think, from the videos that he came from the direction of his girlfriend's house, and then after the incident he was seen going back towards that direction. But, again, the fact that there was a box of ammunition found with his fingerprint, I don't know why it gets to, well, this tells us what happened outside, and this tells us what, if anything, Mr. Earhart did outside. So it's our position that this evidence was merely propensity evidence. And what is troubling is seeing from the district court's ruling on this, the first part of her ruling saying it's relevant to possession of ammunition if the defendant possessed other ammunition. That's textbook propensity evidence. We're putting on this evidence and going to the extent of calling an expert witness on fingerprints so we can say, well, we know he's got some connection to this box, which was also found with 9-caliber ammunition, so he must have been the shooter. He must have been the person who possessed this different brand, different caliber of ammunition. But the box was a 10-millimeter box, right? And so the 9-millimeter stuff, you've got, I think, a fairly strong argument that that doesn't really show us very much at all. But the 10-millimeter box, and then there's 10-millimeter shell casings found at the scene of the shooting, right? And so does that make any difference? I mean, if the box comes in, is there additional harm because the rounds come in? I think if there had been evidence showing he stored any kind of ammunition in that box, regardless of what it was, we'd have a much more difficult argument. But I know, and the government had argued that down below. Well, he stored it there. We don't have any evidence of that. That's pure speculation that somehow this empty box in his girlfriend's apartment must have been where Mr. Earhart got this different brand of ammunition. And there is some evidence he came back and forth from that apartment. But how this interaction occurred is he showed up, Mr. Earhart came outside, and they argued that he had shown a firearm that was on his person. I assume that they're claiming that there's an inference that's drawn. If you've got a box of empty 10-millimeter shells and there's 10-millimeter shell casings there, you could infer that you were in possession of a 10-millimeter weapon. And I would assert that that's speculative, and that's where we're getting into propensity, where we're saying, well, if he's got an empty box of 10-millimeter ammunition, even though it's not the brand, even though we can't say, oh, well, there was other 10-millimeter ammunition that was consistent with the kind that was used in the shooting, it means he must have possessed this other brand, and he must have been the shooter in this case. You need more to show this kind of connection. Why isn't this harmless, though? I tend to agree with you that this is probably out of bounds, but it was pretty weak evidence when you take into account that the victim saw him shoot and there were real shell casings on the scene and all that. It just doesn't seem to me that it was that influential with respect to the verdict. For multiple reasons, Your Honor. The first one, there was no limiting instruction given on the introduction of this evidence. It was admitted under the theory that it was intrinsic, so in those circumstances you're not getting any kind of limiting instruction like you would if it was admitted under 404B. But also, because of that, there's a risk of confusion as to the jury, as to what ammunition is he actually being charged with. And then when you have that, you have the risk of the jury blurring things and saying, well, if they found this box and they found other ammunition, he must have been the shooter in this case. And we would assert the other evidence that was submitted before the jury is insufficient for the government to meet its burden of harmless error in this case. The video evidence itself, it's motion activated, so it's choppy, it's not clear, and we have a separate argument as to that video evidence as well. Did he have a theory that somebody else was the shooter? That I didn't do it, somebody else must have done it? I don't know if that was the theory, Your Honor, but I think the theory was more, you can't prove that it was me and it was a chaotic scene. And that's the way an arriving officer described it when they arrived, that it was chaotic, lots of people moving around, which makes it more troubling with relying on placement. When you have people running around, other individuals hiding firearms, it's just insufficient for them to meet their burden of harmless error. There seemed to be discussion of one of the pieces of evidence or arguments, I guess, based on the evidence is, look, there's five people there, everybody agrees, three didn't have a gun, and is it Diaz, the fellow who was the witness who was shot, had another type of gun, so it's like a process of elimination on who would have had the gun that would have fired this 10 millimeter. Is that accurate, or when you say it's chaotic, were there other people kind of coming in and out and around? And I take your point, there's like one of these, this gun's just missing, and others are hidden, so there was a lot going on. Yes, and I would agree that the government does point out that these other individuals who were present, they testified that they didn't have a firearm, but I don't think that should rule the day, that that's concrete, that they're denying having been a shooter, that that means it must have been Mr. Earhart who shot the firearm, and we can take that as solid, and that's the final answer. So there was people, as far as we can see from the videos that were introduced, it's a very kind of narrow window, you're not seeing what's happening on the periphery, so we just don't have enough for them to meet their burden on harmless error due to the chaotic nature. And I wanted to just touch very briefly on the issue of the narration, and the issue here is not just narration in general. I mean, we see that all the time in criminal trials, the officer here could have said, okay, that person is Mr. Diaz, and that is this person's house. That is not the problem here. The problem here is the officer coming in and saying, not based off of any kind of specialized or unique perspective or experience, saying, okay, he's shooting a gun right here. He didn't say why he reached that conclusion, and that is something that should have been left to the jury, and for those reasons it was improper lay testimony. Going to the fighting main issue at trial is just making a judgment call and telling the jury how to evaluate the evidence. It's not like the Williams case that the government cites, where they're talking about the officer there was helpful to the jury because he's saying, okay, this is a flashbang. It's a similar situation, a surveillance video alleged to be a shooting, but the officer testified, well, what you're seeing here is indicative of a gun going off. We don't have anything like that in this trial. It's simply the detective saying, oh, I think he's shooting a gun. I believe he's shooting a gun, I think is the language he used, and I think he's holding a firearm, which was not his role and not his call to make that should have been left to the jury. If there are no further questions, I'd reserve the remainder of my time. Thank you. Thank you. Mr. Ripley. Thank you, Your Honor. Good morning. May it please the Court. Will Ripley here representing the United States. The evidence of the ammunition box and the bag of ammunition was intrinsic to this crime. It described, it gave, like so much other evidence to the jury, the big picture of how this event unfolded. To be clear on a couple of factual points, the fingerprint was on the tray inside of the box, the tray that you would remove, and inside of that, the rounds are stored. Other evidence showed that Mr. Earhart arrived to the scene of the shooting, which was right next to a vehicle about 80 to 100 feet away from Ms. Buchanan's door. He arrived there from the direction of Ms. Buchanan's residence, and he left and retreated to, after firing these shots, that same residence. You know, I don't know what story it actually completes. That's still completely foreign to me because, as opposing counsel said, you have different brand ammunition and different sized ammunition that doesn't fit in the gun he used. So this looks like plain and simple Rule 404B evidence. It shows, Your Honor, from our perspective, how he was able to arm himself to arrive at the shooting. He armed himself by taking 10-millimeter ammunition out of that box. Yes, the box was Winchester, and yes, what was left behind, what he fired, was two separate brands, Armscor and Hornaday. But the brand really doesn't matter. That box would fit 10-millimeter ammunition, and we see this very, very commonly in shooting situations. Was there any evidence that he used it right before the shooting, the box? The box, it's a conclusion, it's a reasonable deduction from the rest of the evidence, is that that's where, in that drawer, is where he stored his ammunition. And the other caliber, the 9-millimeter, that was still live, that certainly wouldn't fire in the same pistol that fired that 10-millimeter, shows that that is, in fact, where he stores his ammunition. So why introduce the 9-millimeter? If you can get the 10-millimeter box in, why introduce the 9-millimeter, especially because you didn't charge him with that? I still can't figure out why the government didn't charge him with the 9-millimeter ammunition. Well, to show that that is, to take away the other conclusion, which might be that that 10-millimeter box just happened to be there. It didn't happen to be there. It's in the same place as live ammunition, where he stores live ammunition, to answer your question. Why did the government charge him with the 9-millimeter ammunition possession, which then it easily comes in because it's substantive evidence of another crime or another count? So that possession would not have been as direct as his possession of the ammunition that's in the pistol in his hand that we see on video as he's shooting at Mr. Diaz. And so from a presentation to the jury standpoint, it's simpler and cleaner that way, to just charge him with that 10-millimeter that he used to shoot at Mr. Diaz. In the same way that we charge Mr. Diaz with only the pistol, the FN pistol that was recovered and the 5x7 .28 that he discharged, was a second pistol that was hidden alongside Mr. Diaz's by the women that were kind of helping him, if you recall the facts. The decision was made to charge each man with that ammunition that he possessed in that moment that they were shooting at each other. So your position here continues to be that it's intrinsic? Yes. However, as we did brief, we did not assert this at the district court. But nonetheless, we did brief it, and its admission can be upheld under Rule 404B, which is appropriate. You actually disavowed 404B, did you, at the district court?  Which also raises an interesting question as to sort of saying, okay, it's admissible under that, because there wasn't an instruction, a limiting instruction for the jury. So it's a little bit different in just affirming on a different ground. Indeed. I understand your point. And you're right, we did disavow it. Because from our perspective, and I'm standing here arguing this same thing today, is that it was intrinsic to this crime. It was a 10mm box. Did you argue at the district court that your theory was that he just simply stored 10mm in this 10mm box, and so that's where he must have gone to get it? Was that your specific argument? At the point of discussing its admissibility or to the jury, Your Honor? Either one or both. At the point of discussing its admissibility, yes. To the jury, no. It was not argued. What we argued to the jury was, this was Mr. Earhart. Mr. Diaz sat in that chair and told you it was him. The video shows it was him. The earlier response, the damage to Ms. Buchanan's vehicle that kind of started this dispute, police responded to that, and Mr. Earhart was captured clearly on a body camera wearing the same clothes that you see in the later shooting video. So how did you tell the jury? When you were talking about the empty box, what did you tell the jury about how they should use that piece of evidence? Or also the separate other, I think there were several rounds. Loose rounds, yes.  How did you tell the jury to consider the loose rounds and the empty box? We did not argue the loose rounds in any way. As far as the box of 10 millimeter, we argued that in that drawer was also indicia for him and he is associated with that. That had come out through testimony of some other witnesses there. They knew the relationship between Mr. Earhart and Ms. Buchanan. And so we argued that he, the same man that you see on video shooting the 10 millimeter pistol, had an empty box of 10 millimeter ammunition in his residence. And so that further kind of told the story that in fact it is Mr. Earhart who did that shooting. It completed that story. And that's why it was intrinsic evidence. I'll address the issue of the narration. As we pointed out in our brief, it wasn't just through inquiry from the government that members of the Iowa City Police Department discussed what they saw. And based on their training experience, their interpretation, their opinion, their lay opinion of what was on the video. It was also Detective Gabe Cook, which was through quite a bit of cross-examination from Mr. Earhart's trial counsel. But regardless, this video was, if you watch it, it doesn't flow smoothly. I think he did testify a little bit about the choppy nature, why it is, the time stamp. Those seems to be things that are helpful to the jury to understand this particular exhibit. But when he gets into, you know, the question here is, did Mr. Earhart shoot a gun on this video? And the detective says, look there, that's Mr. Earhart. And here's where he's raising his arm and he's shooting. Yeah. Although he's charged with just possessing the ammunition, he wasn't charged directly with shooting it. But isn't your theory that because he shot this firearm at Mr. Diaz, he was in possession of the ammunition that was projected from the gun? Yes. Yes. But also, law enforcement and Detective Bunch have training, of course, in firearms. And what he was describing is kind of the stance and the arm position that you see. Because the way the video progressed, you see Mr. Earhart walking down the sidewalk towards the vehicle in which Mr. Diaz was sitting. And then it jumps to, all of a sudden, the three other women. So the five people that were there are on video. And then it jumps to Mr. Diaz retreating to his sister's residence. And now Mr. Earhart has kind of moved into the street. And you see him running and at one point stopping and raising his arm like this. And it was those motions that Detective Bunch was putting into context and explaining based on his training experience, providing his lay opinion on that. In addition to explaining why we were jumping from kind of moment to moment. And that's what you, Judge Kelly, were alluding to a moment ago. The court's aware of this. But, of course, there was no objection to that testimony. And our position is that even if it was erroneous, it certainly wasn't one that affected substantial rights. And it seriously called into question those things that we are concerned with on a plain error review. You know, the rule on lay witness opinions is that the opinion is only admissible if it assists the jury in making a determination and if it doesn't invade the province of the jury. And so I'm looking at this whole thing and he assumes a shooting posture. I think you can say that. This appears to be a shooting posture consistent with my training and experience. But that's him shooting. That seems a different animal to me. That seems to really go to that sort of, first it goes to the ultimate question, but it really doesn't seem like an admissible lay opinion. Because really all you have is he's in a shooting posture. Indeed. Some of that testimony, it's a matter of type of description in the moment. He's shooting really could be a substitute for he's taking a shooting posture. But I think maybe ultimately at the end of the day, this does get to a question that Judge Strauss raised earlier, which is how is this not harmless? Because we have, if you're right, Judge Erickson, we have casings on the ground, clear evidence of a shooting. We have Mr. Diaz, his testimony. We have the injury, the loss of the eyeball. There was a shooting. We have holes in the vehicle. And so I guess unless there are other questions, I'll end on that point. Thank you all. Thank you. I'll start first with how the ammunition box was used as part of an argument. In closing, the prosecution said, and of all the people in the whole world, who is going to be upset with Mr. Ortega and have access to an apartment with an empty box of 10 millimeter ammunition? Our position is that is a propensity argument. You're saying, well, it's this guy. He's around ammunition. He's got an empty box. It's not them coming out and saying, and our argument would be it would be too speculative to say anyways, well, we can see that an argument unfolds and then Mr. Earhart goes in, he goes in and gets this ammunition and comes back. I don't think that's what the facts lay out anyways. In Iowa, I mean, I could tell you make this argument in North Dakota and you say there's an empty ammo box in somebody's dresser drawer. It would be like, so, okay, every third guy's got that going on, and then you'd say 10 millimeter, that's not such an unusual round that having an empty box would be unusual. It's really just his fingerprint on it, and your point is that at that point that is just pure propensity? Yes, especially if it's about connection and when you have, maybe if the fingerprint analysis could have come in and said, oh, this is incredibly fresh fingerprint, I can say it came on. The fingerprint expert could not testify as to that, so we have no idea what that means, how it was touched. I agree it was the plastic tray or when that happened, so it's really just propensity and it's not relevant. I have one more question for you on this harmlessness issue. One thing I'm not sure if you addressed, excuse me, in your main argument, opening argument, what about the identification by, it's Mr. Diaz, am I right? Yes. And while I know there was some cross-examination about what he told the officers initially and then what he testified to, why isn't that enough given sort of the other supportive evidence, just seeing a video, we've got the shells and the people there. What's your reason why that isn't enough just to uphold the verdict? Given that it's the government's burden to establish harmless error and the significant credibility issues with Mr. Diaz and how he came to with this story and that what the court mentioned a lot of cross-examination, but he denied, not only denied knowing who shot him, he denied that he even had a firearm that day, but the problem was his denials didn't stop in the initial police interaction. When he was at trial, he lied before the jury. He said, well, I didn't make any statements denying a firearm, and that was patently false. So when you have a witness who only changes his testimony after being shown the videos, when he's charged, pursuant to a proffer agreement, that's insufficient to establish harmless error in this case. Thank you. Thank you both for your arguments.